# Exhibit 1

Case 2:21-cv-03283-JS-SIL   Document 1-1   Filed 06/10/21   Page 2 of 36 PageID #: 11

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF SUFFOLK

|  |  |
|---|---|
| THE CITY OF NEW YORK; COUNTY OF SUFFOLK, NEW YORK; COUNTY OF BROOME, NEW YORK; COUNTY OF COLUMBIA, NEW YORK; COUNTY OF DUTCHESS, NEW YORK; COUNTY OF ERIE, NEW YORK; COUNTY OF FULTON, NEW YORK; COUNTY OF GREENE, NEW YORK; COUNTY OF HERKIMER, NEW YORK; COUNTY OF LEWIS, NEW YORK; COUNTY OF MONROE, NEW YORK; COUNTY OF MONTGOMERY, NEW YORK; COUNTY OF ONTARIO, NEW YORK; COUNTY OF ORANGE, NEW YORK; COUNTY OF OSWEGO, NEW YORK; COUNTY OF SCHENECTADY, NEW YORK; COUNTY OF SENECA, NEW YORK; COUNTY OF ST. LAWRENCE, NEW YORK; COUNTY OF SULLIVAN, NEW YORK; COUNTY OF ULSTER, NEW YORK; COUNTY OF WASHINGTON, NEW YORK;  and COUNTY OF WYOMING, NEW YORK, <br><br> Plaintiffs <br><br> - against – <br><br> MCKINSEY & COMPANY, INC. and MCKINSEY & COMPANY, INC. UNITED STATES, <br><br> Defendants. | Index No. <br><br><br> COMPLAINT |

## TABLE OF CONTENTS

*Page*

INTRODUCTION ................................................................................................1

JURISDICTION AND VENUE ...........................................................................3

PARTIES ..............................................................................................................3

FACTUAL ALLEGATIONS ...............................................................................7

McKinsey's Agreement with Purdue......................................................7

The Corporate Integrity Agreement.......................................................7

McKinsey's Role Following the CIA ......................................................8

*The Sacklers Seek to Divert Money to Themselves*............................... 8

*McKinsey Supplied Purdue with Sales and Marketing Strategies and Remained Intimately Involved in Implementing Those Strategies* ........................................ 9

*Project Turbocharge* ........................................................................................................... 11

*McKinsey Knew About the Dangers of Opioids and Acted to Maximize OxyContin Prescriptions Anyway* ........................................................................................ 14

Purdue's 2020 Guilty Plea and McKinsey's Recent Statement ...................................... 16

Impact of Opioid Abuse, Addiction, and Diversion in Plaintiffs' Communities ........ 19

Joint and Several Liability with Purdue ........................................................................... 23

CAUSES OF ACTION ............................................................................................................. 24

JURY DEMAND ...................................................................................................................... 32

PRAYER FOR RELIEF ........................................................................................................... 32

ii

# INTRODUCTION

1.       In this action, Plaintiffs The City of New York; County of Suffolk, New York; County of Broome, New York; County of Columbia, New York; County of Dutchess, New York; County of Erie, New York; County of Fulton, New York; County of Greene, New York; County of Herkimer, New York; County of Lewis, New York; County of Monroe, New York; County of Montgomery, New York; County of Ontario, New York; County of Orange, New York; County of Oswego, New York; County of Schenectady, New York; County of Seneca, New York; County of St. Lawrence, New York; County of Sullivan, New York; County of Ulster, New York; County of Washington, New York; and County of Wyoming, New York ("Plaintiffs") seek to hold Defendants McKinsey & Company, Inc. and McKinsey & Company, Inc. United States ("McKinsey") responsible for their role in creating the opioid crisis throughout the United States, the State of New York and, in particular, with the Plaintiffs' communities. This crisis, the worst man-made epidemic in history, arose from opioid manufacturers' deliberately deceptive marketing strategy to expand opioid use.   McKinsey played a major role in crafting and implementing that strategy.

2.       In 2007, Purdue Pharma, L.P ("Purdue) pleaded guilty to criminal misbranding in connection with its misleading marketing campaign for OxyContin.  That campaign had turned OxyContin, an addictive drug similar to heroin, into a blockbuster drug to which millions of Americans would become addicted.  After the guilty plea, McKinsey worked closely with Purdue to further dramatically increase OxyContin sales to the benefit of McKinsey, Purdue, and the Sackler family, the wealthy family that has owned and operated Purdue for decades.  McKinsey specifically sought to "supercharge" OxyContin sales by evading the requirements of a "Corporate Integrity Agreement" that Purdue entered as part of its guilty plea.

3.       McKinsey did this in order to aid the Sacklers in their plan to inflate, temporarily, the value of Purdue so that the company could be sold.  The Sacklers were

1

Case 2:21-cv-03283-JS-SIL   Document 1-1   Filed 06/10/21   Page 5 of 36 PageID #: 14

concerned about potential liability for the opioid crisis, which was already taking shape, and were further concerned about the obligations Purdue had undertaken pursuant to the CIA. The Sacklers needed to sell a lot of OxyContin quickly—in McKinsey's terminology, to "turbocharge" OxyContin sales—and then sell the company based on a valuation reflecting those sales, without engaging (or appearing to engage) in the same type of criminal conduct that had led to its guilty plea.

4.      McKinsey devised a strategy for Purdue to do exactly that. McKinsey did so knowing that these increased sales of opioids would result in increased addiction, overdoses, and deaths. It sought to capitalize on this increased addiction, knowing that addiction was, in the short run at least, good for business, turning unwitting patients into customers for life, and inflating Purdue's profits to make the company attractive for sale. And neither McKinsey nor the Sacklers expected to have to worry about the long-run, when the consequences of rampant drug abuse, addiction, and overdose became clear— by then, they assumed, the Sacklers would be out of the OxyContin business and McKinsey would have moved on to other projects.

5.      McKinsey's strategy worked, in part. OxyContin sales *did* soar, just when, as a result of the CIA, they might have been expected to decline. And the resulting increases in addiction, overdoses, and death occurred, just as expected. But the Sacklers never did sell Purdue. Instead, when the bill came due—when cities, States, and counties around the country sued Purdue and the Sacklers for their role in creating the opioid epidemic—the Sacklers, having extracted billions of dollars from the company—put Purdue into bankruptcy.

6.      As the architect of Purdue's "turbocharged" OxyContin sales, McKinsey shares responsibility for the tragic results of mass-marketing a dangerously addictive drug. Indeed, McKinsey has admitted as much, reaching agreement with 49 States (including New York), the District of Columbia, and five U.S. territories to pay fines and compensation arising from precisely this conduct. But the cities and counties in New

York, including the Plaintiff, have borne the brunt of the crisis and bear the brunt of addressing the nuisance that McKinsey's conduct has created. McKinsey is liable to them as well.

## JURISDICTION AND VENUE

7.  This Court has jurisdiction over this action pursuant to New York Constitution, article VI, § 7(a) and CPLR 301 and 302.

8.  Venue is proper pursuant to CPLR 503 and by order of the New York Litigation Coordinating Panel.

9.  This action is non-removable because there is no diversity among the parties and no substantial federal question is presented.

## PARTIES

10.  Plaintiff The City of New York is a municipal corporation organized and existing under and by virtue of the laws of the State of New York.

11.  Plaintiff County of Suffolk, New York, is a New York county that provides a wide range of services on behalf of its residents, including but not limited to services for families and children, public health, public assistance, law enforcement, and emergency care.

12.  Plaintiff County of Broome, New York is a New York county that provides a wide range of services on behalf of its residents, including but not limited to services for families and children, public health, public assistance, law enforcement, and emergency care.

13.  Plaintiff County of Columbia, New York is a New York county that provides a wide range of services on behalf of its residents, including but not limited to services for families and children, public health, public assistance, law enforcement, and emergency care.

14.  Plaintiff County of Dutchess, New York is a New York county that provides a wide range of services on behalf of its residents, including but not limited to services

3

Case 2:21-cv-03283-JS-SIL   Document 1-1   Filed 06/10/21   Page 7 of 36 PageID #: 16

for families and children, public health, public assistance, law enforcement, and emergency care.

15.     Plaintiff County of Erie, New York is a New York county that provides a wide range of services on behalf of its residents, including but not limited to services for families and children, public health, public assistance, law enforcement, and emergency care.

16.     Plaintiff County of Fulton, New York is a New York county that provides a wide range of services on behalf of its residents, including but not limited to services for families and children, public health, public assistance, law enforcement, and emergency care.

17.     Plaintiff County of Greene, New York is a New York county that provides a wide range of services on behalf of its residents, including but not limited to services for families and children, public health, public assistance, law enforcement, and emergency care.

18.     Plaintiff County of Herkimer, New York is a New York county that provides a wide range of services on behalf of its residents, including but not limited to services for families and children, public health, public assistance, law enforcement, and emergency care.

19.     Plaintiff County of Lewis, New York is a New York county that provides a wide range of services on behalf of its residents, including but not limited to services for families and children, public health, public assistance, law enforcement, and emergency care.

20.     Plaintiff County of Monroe, New York is a New York county that provides a wide range of services on behalf of its residents, including but not limited to services for families and children, public health, public assistance, law enforcement, and emergency care.

21.     Plaintiff County of Montgomery, New York is a New York county that

4

Case 2:21-cv-03283-JS-SIL   Document 1-1   Filed 06/10/21   Page 8 of 36 PageID #: 17

provides a wide range of services on behalf of its residents, including but not limited to services for families and children, public health, public assistance, law enforcement, and emergency care.

22.     Plaintiff County of Ontario, New York is a New York county that provides a wide range of services on behalf of its residents, including but not limited to services for families and children, public health, public assistance, law enforcement, and emergency care.

23.     Plaintiff County of Orange, New York is a New York county that provides a wide range of services on behalf of its residents, including but not limited to services for families and children, public health, public assistance, law enforcement, and emergency care.

24.     Plaintiff County of Oswego, New York is a New York county that provides a wide range of services on behalf of its residents, including but not limited to services for families and children, public health, public assistance, law enforcement, and emergency care.

25.     Plaintiff County of Schenectady, New York is a New York county that provides a wide range of services on behalf of its residents, including but not limited to services for families and children, public health, public assistance, law enforcement, and emergency care.

26.     Plaintiff County of Seneca, New York is a New York county that provides a wide range of services on behalf of its residents, including but not limited to services for families and children, public health, public assistance, law enforcement, and emergency care.

27.     Plaintiff County of St. Lawrence, New York is a New York county that provides a wide range of services on behalf of its residents, including but not limited to services for families and children, public health, public assistance, law enforcement, and emergency care.

5

Case 2:21-cv-03283-JS-SIL   Document 1-1   Filed 06/10/21   Page 9 of 36 PageID #: 18

28.     Plaintiff County of Sullivan, New York is a New York county that provides a wide range of services on behalf of its residents, including but not limited to services for families and children, public health, public assistance, law enforcement, and emergency care.

29.     Plaintiff County of Ulster, New York is a New York county that provides a wide range of services on behalf of its residents, including but not limited to services for families and children, public health, public assistance, law enforcement, and emergency care.

30.     Plaintiff County of Washington, New York is a New York county that provides a wide range of services on behalf of its residents, including but not limited to services for families and children, public health, public assistance, law enforcement, and emergency care.

31.     Plaintiff County of Wyoming, New York is a New York county that provides a wide range of services on behalf of its residents, including but not limited to services for families and children, public health, public assistance, law enforcement, and emergency care.

32.     Defendant McKinsey & Company, Inc. ("MNY") is a New York corporation with its principal place of business at 711 Third Avenue, New York, NY 10017. It may be served with process through its registered agent, Corporation Service Company, 80 State Street, Albany, New York 12207.

33.     Defendant McKinsey & Company, Inc. United States ("MUS") is a Delaware corporation with its principal office at 711 Third Avenue, New York, NY 10017. It may be served with process through its registered agent, Corporation Service Company, 80 State Street, Albany, New York 12207.

34.     MNY exercised complete domination of MUS in respect to the wrongdoing alleged herein, and such domination was used to commit a fraud or wrong against Plaintiffs which resulted in Plaintiffs' injuriesy. MUS is a mere shell company, having no

6

meaningful separate existence or operations apart from that of MNY. In committing the wrongs alleged herein MUS and MNY conducted their affairs as a single integrated enterprise or, alternatively, as a joint enterprise.

## FACTUAL ALLEGATIONS

### McKinsey's Agreement with Purdue

35.     With effect as of March 1, 2004, MUS entered into a Master Consulting Agreement (the "Agreement") with Purdue Pharma L.P.  ("PPLP").

36.     PPLP was the successor to The Purdue Frederick Company, Inc. ("PFC"), which was a New York corporation headquartered in Connecticut.

37.     At all relevant times PFC and PPLP were members of a pharmaceutical business enterprise ("Purdue") each member of which was wholly owned directly or indirectly through family trusts and holding companies, 50% by the family of Mortimer D. Sackler, M.D. and 50% by the family of Raymond R Sackler, M.D. (the "Sacklers").

### The Corporate Integrity Agreement

38.     In May of 2007, PFC pleaded guilty to federal charges for misleading regulators, doctors, and the public regarding Purdue's opioid OxyContin. In pleading guilty, PFC admitted to falsely marketing OxyContin as a less addictive, safer alternative to other pain medications.

39.     Pursuant to its Plea Agreement with the United States, PFC agreed to pay a fine of over $600 million, and PPLP entered into a Corporate Integrity Agreement ("CIA") with the U.S. Department of Health and Human Services Office of Inspector General.

40.     Under the CIA, for five years, Purdue was required to refrain from making any deceptive or misleading claims about OxyContin and was obligated to submit regular compliance reports regarding its sales and marketing practices. Purdue was also required to monitor, report, and attempt to prevent inappropriate prescribing practices.

Case 2:21-cv-03283-JS-SIL   Document 1-1   Filed 06/10/21   Page 11 of 36 PageID #: 20

## McKinsey's Role Following the CIA

### *The Sacklers Seek to Divert Money to Themselves*

41.     The Sackler family is among the richest families in the United States. Members of the Sackler family have controlled Purdue at all times relevant to this complaint, not merely as the sole owners, but also as members of the board and as executive officers and agents.

42.     Following the guilty plea, the Sacklers sought to insulate themselves from the risk they perceived in the continued operation of the Purdue business of selling opioids. Ten days after the guilty plea was announced, David Sackler wrote to his father, Richard Sackler, and uncle, Jonathan Sackler, concerning the risk the family now faced: legal liability for selling OxyContin. Although Jonathan Sacker asserted that there was no basis to sue members of the family, David asserted otherwise, writing: "We will be sued. Read the op-ed stuff in these local papers and ask yourself how long it will take these lawyers to figure out that we might settle with them if they can freeze our assets and threaten us."

43.     On April 18, 2008, Richard Sackler, then the co-chairman of the board along with his uncle, communicated to other family members that Purdue's business of selling OxyContin and other opioids was "a dangerous concentration of risk." One option to address this risk was to sell the company to, or merge the company with, another pharmaceutical manufacturer. The proceeds of such a transaction could then be re-invested in diversified assets, thereby achieving the Sacklers' desired insulation from liability for the ongoing opioid business.

44.     Another option was to have Purdue borrow money in order to assure Purdue had adequate funds to continue operating while the Sacklers, as owners, should "distribute more free cash flow" to themselves. This would have the effect of maximizing the amount of money they, as owners, could extract from the business and invest elsewhere.

8

Case 2:21-cv-03283-JS-SIL   Document 1-1   Filed 06/10/21   Page 12 of 36 PageID #: 21

45.     In order to pursue either of these options, the Sacklers needed to maximize opioid sales in the short term so as to make Purdue—by then the subject of substantial public scrutiny—appear either as an attractive acquisition target or merger partner to another pharmaceutical manufacturer or as a creditworthy borrower to a lender. In short, the Sacklers planned to engage in a final flurry of opioid pushing in order to cash themselves out of their pharmaceutical business.

### McKinsey Supplied Purdue with Sales and Marketing Strategies and Remained Intimately Involved in Implementing Those Strategies

46.     McKinsey touts its model of engaging in "transformational" partnerships with its clients. Rather than giving one-off advice, McKinsey learns each client's business intimately and provides tailored, granular strategies.

47.     Once a client has adopted the strategy recommended, McKinsey assists in implementing that strategy. By the time it was working with Purdue, implementation services were a core component of the overall suite of services that McKinsey provided. Describing McKinsey's approach to implementation, one McKinsey consultant stated, "On some of the most successful engagements I've seen, you can't even tell the difference between a McKinsey team member and one of our clients because we're working that cohesively together." Another McKinsey Senior Implementation Coach described McKinsey's approach: "We're in there interacting with every element of that organization, from the welders or mechanics on the front line, all the way up to the board of directors."

48.     In the broadest of generalities, then, McKinsey's business model, as a provider of strategy and implementation consulting services, is to partner with clients to pursue business objectives identified by McKinsey. Once the objective is identified, the client and McKinsey then engage in concerted action as a seamless and cohesive unit in order to implement the necessary means to achieve those objectives for the client.

49.     In 2009, McKinsey was tasked with increasing OxyContin sales despite the

9

CIA, which required, among other things, that Purdue comport with FDA requirements and also included increased review and reporting obligations.

50.    McKinsey provided sales and marketing strategies designed to sell as much OxyContin as possible, at one point in 2010 telling Purdue that the new strategies McKinsey had developed could generate as much as $400 million in additional annual sales. After Purdue accepted McKinsey's advice, McKinsey worked with Purdue to implement the strategies McKinsey had developed, with McKinsey's ongoing and extensive involvement.

51.    As a result of McKinsey's advice to, and aiding and abetting of, Purdue, OxyContin sales grew dramatically, and the Sacklers diverted the resulting profits into other holdings that they intended would be beyond the reach of judgment creditors

52.    In a 2009 report, among other sales strategies, McKinsey advised Purdue sales representatives to push the highest dosages of OxyContin, which were the most profitable for Purdue, but which were also the most likely to result in addiction. In order to maximize dosages and improve targeting of the coordinated marketing strategy, McKinsey investigated the prescribing habits of individual physicians.

53.    McKinsey helped shape Purdue's OxyContin marketing to circumvent the CIA.  The CIA imposed restrictions on representations regarding the "withdrawal, drug tolerance, drug addiction or drug abuse of Purdue's products."  To avoid running afoul of this restriction, McKinsey advised Purdue to market OxyContin based on the false and misleading notion that the drug can provide "freedom" and "peace of mind" for its users, and concomitantly reduce stress and isolation.

54.    One Purdue advertisement said, "We sell hope in a bottle," despite the fact that both McKinsey and Purdue already understood the addiction problems associated with opioid use and abuse.  McKinsey encouraged Purdue to tell doctors that OxyContin would give their patients "the best possible chance to live a full and active life," although they knew there was no evidence to support this claim.

10

55.     McKinsey urged Purdue to train and incentivize its sales representatives to increase sales across the market for opioids, even if sales went to Purdue's competitors. This was intended to serve the Sackler family's goal of increasing the marketability of Purdue for potential mergers, but it had the effect of worsening the opioid crisis even beyond the portion of the crisis directly attributable to sales and use of OxyContin.

*Project Turbocharge*

56.     The Corporate Integrity Agreement expired in 2012. With this restriction lifted, McKinsey devised additional marketing and sales strategies for Purdue to further increase OxyContin sales.

57.     In the second half of 2013, McKinsey made recommendations to Purdue to increase OxyContin revenue, including "Turbocharging Purdue's Sales Engine."

58.     McKinsey's "Project Turbocharge" recommendations included revising the existing process for targeting high-prescribing physicians, with a shift from targeting solely on the basis of prescription deciles to considering additional factors. Based on its analysis, McKinsey told Purdue that "[t]here is significant opportunity to slow the decline of OxyContin by calling on more high-value physicians" and that "[t]he revenue upside from sales re-targeting and adherence could be up to $250 million."

59.     Also as part of the Project Turbocharge recommendations, McKinsey determined and advised Purdue that the top half of prescribing physicians "write on average 25 times more scripts per prescriber" than the lower half. McKinsey advised Purdue that visiting high- prescribing doctors many times per year increased sales.

60.     Despite knowing that then-recently-expired CIA had required Purdue to refrain from improperly incentivizing OxyContin sales, McKinsey also recommended increasing incentive compensation for incremental OxyContin prescriptions, advising Purdue that "[r]evision to incentive comp could better align reps to Purdue's economics."

61.     At the same time, McKinsey recommended decreasing training by six days a year in order to allow employees more time to make sales calls. Meanwhile, McKinsey

11

advised Purdue to exercise closer control over its sales staff in order to generate more efficient physician targeting. McKinsey knew that, combined with the strictures of sales quotas and less training for the sales force, bonus/incentive compensation to the sales representatives based on the number of OxyContin prescriptions the representative produced could be a powerful driver of incremental OxyContin sales

62.     McKinsey also recommended that Purdue circumvent pharmacies entirely with a mail-order program because enforcement by federal regulators was decreasing OxyContin dispensing through Walgreens.

63.     At the board level, McKinsey urged the Sacklers to impose a "revenue growth goal" on management.

64.     The Sacklers were impressed with McKinsey's work. On August 15, 2013, Richard Sackler emailed Mortimer D.A. Sackler, "the discoveries of McKinsey are astonishing."

65.     Eight days later, on August 23, 2013, McKinsey partners met with the Sackler family in order to pitch Project Turbocharge. Dr. Arnab Ghatak, one of the McKinsey partners leading the Purdue account, recounted the meeting to fellow partner Martin Elling in an email exchange: "[T]he room was filled only with family, including the elder statesman Dr. Raymond [Sackler] … We went through exhibit by exhibit for about 2 hrs. … They were extremely supportive of the findings and our recommendations … and wanted to . . . strongly endorse getting going on our recommendations."

66.     Elling, a co-leader of the Purdue account, remarked in the same email correspondence that McKinsey's "findings were crystal clear to" the Sacklers, and that the Sacklers "gave a ringing endorsement of 'moving forward fast.'"

67.     In September, Purdue began to implement Project Turbocharge based on McKinsey's recommendations. In adopting Project Turbocharge, Purdue acknowledged the improper connotations of the name, and re-branded the initiative "Evolve to

Case 2:21-cv-03283-JS-SIL Document 1-1 Filed 06/10/21 Page 16 of 36 PageID #: 25

Excellence."

68.     Evolve to Excellence ("E2E") was the theme of Purdue's 2014 National Sales Meeting.

69.     After Purdue adopted McKinsey's recommendations, McKinsey continued to work with Purdue sales and marketing staff, reporting to Purdue executive Russell Gasdia during Purdue's implementation of McKinsey's recommendations.

70.     In fact, the entire E2E initiative was overseen jointly by McKinsey and Purdue executives, who together comprised the E2E Executive Oversight Team and Project Management Office.

71.     The Sacklers were kept informed of the implementation of McKinsey's OxyContin strategy. At the September 13, 2013 Board meeting, the Board discussed with the Sacklers the ongoing implementation of McKinsey's recommendations.

72.     McKinsey's efforts had the effect the Sacklers had asked McKinsey to achieve. Sales of OxyContin tripled in the years following the 2007 guilty plea, despite the restrictions imposed by the CIA. According to the U.S. Department of Justice, "[f]rom 2010 to 2018, Purdue's profits were almost entirely driven by its success in selling OxyContin."

73.     Thus, while the Sacklers did not sell Purdue or enter into a merger, their goals of increasing sales and extracting wealth from the business were realized.

74.     In 2007, the year of Purdue's guilty plea, net sales of OxyContin totaled approximately $1 billion. The guilty plea did little to stem Purdue's blistering growth rate. In fact, by 2010, as a result of McKinsey's advice and active assistance to Purdue and the Sacklers, OxyContin sales exceeded $3 billion: a *tripling* of revenue from OxyContin sales.

75.     With McKinsey's advice and assistance, OxyContin sales reached an all-time peak in 2013, the year McKinsey and Purdue implemented E2E a/k/a Project Turbocharge.  That OxyContin sales peaked in 2013 is especially notable, given that

13

Case 2:21-cv-03283-JS-SIL Document 1-1 Filed 06/10/21 Page 17 of 36 PageID #: 26

overall opioid prescriptions had peaked three years earlier, in 2010. McKinsey's efforts added a final boost to OxyContin sales before the eventual unraveling, and Purdue's decision, in the end, to cease marketing the drug.

76. By 2018, with OxyContin sales in their inexorable decline, Purdue announced that it would cease sending sales representatives to healthcare providers to promote OxyContin. The ranks of sales representatives were cut back to the approximate size of Purdue's sales staff prior to the initial launch of OxyContin.

77. The Sackler's other goal—extracting wealth from Purdue—was also met. The Sackler family has withdrawn over $10 billion from Purdue since 2008, including $1.7 billion in 2009 alone. These distributions were made possible by McKinsey's advice and active assistance and came at the expense of a deepening national opioid crisis and grave harm to Plaintiffs.

### McKinsey Knew About the Dangers of Opioids and Acted to Maximize OxyContin Prescriptions Anyway

78. McKinsey has a long history of consulting in the pharmaceutical industry. In addition to its work with Purdue since 2004, McKinsey has performed "opioid-related work" for Johnson & Johnson, Endo International, and Mallinckrodt Pharmaceuticals, each of which manufactured and sold opioids. For instance, a McKinsey PowerPoint presentation prepared for Johnson & Johnson recommended that Johnson & Johnson aggressively target and influence doctors treating back pain in order to increase opioid sales.

79. Purdue's highly publicized 2007 guilty plea put McKinsey on notice of its client's misconduct. By that time, McKinsey had access to public information indicating that OxyContin and other opioids pose significant risk of addiction and misuse—and that the actions and omissions of their several opioid manufacturer clients, including but not limited to Purdue, were actually contributing to a nationwide opioid epidemic.

80. As early as 2009, McKinsey was asked to assist Purdue with "countering

14

Case 2:21-cv-03283-JS-SIL   Document 1-1   Filed 06/10/21   Page 18 of 36 PageID #: 27

the emotional messages from mothers with teenagers that overdosed on OxyContin."

81.     McKinsey also worked with Purdue to counter the understanding of doctors and patients about the significant risks of OxyContin. McKinsey's presentations to Purdue in 2013 included extensive discussion of doctors' concerns about opioid misuse and side effects. On September 13, 2013 McKinsey briefed Purdue on the ongoing concerns regarding OxyContin addiction and diversion among prescribers, noting that "side effects and addiction are concerns" of prescribers and that "[m]ost prescribers are concerned about abuse, but attempt to establish measures to protect themselves," and that "diversion, abuse and regulatory concerns continue to weigh on prescribers." Rather than working to limit these disastrous effects, McKinsey treated doctors' misgivings as obstacles to be overcome with new messaging.

82.     McKinsey continued to assist Purdue to turbocharge sales long after the severity of the opioid crisis was well known. On October 23, 2017, the President of the United States declared the ongoing nationwide opioid epidemic a "public health emergency." Even at this late hour in the crisis, McKinsey continued to propose solutions to the Sacklers and Purdue to further boost opioid sales. These solutions were fashioned, in perfect McKinsey parlance, as "high impact interventions to rapidly address market access challenges."

83.     Less than two months after the public health emergency declaration, McKinsey proposed these high impact interventions to Purdue and its board. Among them was perhaps McKinsey's most audacious gambit of the entire Purdue relationship: paying money—"rebates"—to health insurers whenever someone overdosed on Purdue's drug or was diagnosed with opioid use disorder ("OUD").

84.     The money would be paid to health insurers for the increased costs of additional medical services that resulted from the fact that Purdue's medications caused opioid-use disorder and overdoses in people whose health care costs were the payors' obligation. The money McKinsey proposed Purdue pay out in these circumstances

15

Case 2:21-cv-03283-JS-SIL   Document 1-1   Filed 06/10/21   Page 19 of 36 PageID #: 28

would not go to the individuals afflicted or to the families of the dead. Clearly, they were designed to allay the concerns of insurers and discourage them from restricting access to opioids in the first place.

85.    McKinsey called these payments for future OxyContin overdoses and addictions "Event-Based Contracts." McKinsey's analysis of "Important considerations when designing an Event-Based Contract" shows that McKinsey knew precisely how many opioid overdoses/OUD diagnoses there were each year, that it knew the rate of overdoses and OUD per member of a health insurance plan, that it projected that rate going forward. Indeed, it actually calculated the cost to Purdue of these overdose rebates to be in a range of $3-15 million per year.

86.    A former McKinsey consultant described McKinsey's work with Purdue as "the banality of evil, M.B.A. edition ...They knew what was going on. And they found a way to look past it, through it, around it, so as to answer the only questions they cared about: how to make the client money, and when the walls closed in, how to protect themselves."

87.    In a 2018 email exchange, two McKinsey senior partners who had participated in McKinsey's work advising and assisting Purdue—apparently fearing consequences for this work—discussed deleting or destroying documents related to opioids.

88.    McKinsey's actions as alleged above were committed in knowing, reckless, and wonton disregard for the health and safety of others. Its conduct was so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.

**Purdue's 2020 Guilty Plea and McKinsey's Recent Statement**

89.    In October of 2020, Purdue once again reached an agreement with the U.S. Department of Justice to enter a guilty plea related to its marketing of OxyContin (the "2020 Settlement Agreement"). The agreement includes $8.3 billion in penalties from

16

Case 2:21-cv-03283-JS-SIL   Document 1-1   Filed 06/10/21   Page 20 of 36 PageID #: 29

Purdue and $225 million from the Sackler family.

90.     In the 2020 Settlement Agreement, Purdue pleaded guilty to defrauding health agencies, violating anti-kickback laws, paying illegal kickbacks to doctors, and "using aggressive marketing tactics to convince doctors to unnecessarily prescribe opioids—frivolous prescriptions that experts say helped fuel a drug addiction crisis that has ravaged America for decades."

91.     The 2020 Settlement Agreement includes a provision specifically reserving claims regarding "[a]ny liability of entities other than the [Purdue Bankruptcy] Debtors, including consultants."

92.     In the agreement, Purdue agreed to plead guilty to a dual-object conspiracy to defraud the United States and to violated the Food, Drug and Cosmetic Act, 21 U.S.C. § 331, 353, among other charges, relating to its opioid sales and marketing practices after the 2007 guilty plea.  The new plea agreement does not identify Purdue's co-conspirators, and McKinsey is not identified by name in the agreement. Instead, McKinsey is referred to as the "consulting company."

93.     Purdue's 2020 guilty plea concerns Covered Conduct (as defined in the plea agreement) that directly implicates McKinsey in the conspiracy. It is the same conduct described in this Complaint.

94.     In the agreement, Purdue admits that it adopted the recommendations of the consulting company (that is, of McKinsey) and that Purdue's E2E program was "overseen by" the consulting company (that is, McKinsey) in conjunction with some of Purdue's top executives.

95.     On December 5, 2020, McKinsey issued the following statement regarding its work with Purdue:

> *December 5, 2020*-As we look back at our client service during the opioid crisis, we recognize that we did not adequately acknowledge the epidemic unfolding in our communities or the terrible impact of opioid misuse and addiction on millions of families across the country. That is why last year

17

Case 2:21-cv-03283-JS-SIL   Document 1-1   Filed 06/10/21   Page 21 of 36 PageID #: 30

we stopped doing any work on opioid-specific business, anywhere in the world.

Our work with Purdue was designed to support the legal prescription and use of opioids for patients with legitimate medical needs, and any suggestion that our work sought to increase overdoses or misuse and worsen a public health crisis is wrong. That said, we recognize that we have a responsibility to take into account the broader context and implications of the work that we do. Our work for Purdue fell short of that standard.

We have been undertaking a full review of the work in question, including into the 2018 email exchange which referenced potential deletion of documents. We continue to cooperate fully with the authorities investigating these matters.

96.     In recent weeks, McKinsey has settled opioid-related claims with 49 states, the District of Columbia, and five U.S. territories.

97.     Although McKinsey stated that it has stopped opioid-related work "anywhere in the world," the Sacklers and McKinsey appear to have something else in mind. In August of 2013, when the Sacklers adopted McKinsey's "Project Turbocharge" for Purdue, Tim Reiner, a long-time McKinsey consultant, joined Mundipharma.

98.     Mundipharma is a global network of associated companies operating outside the United States that manufacture and sell opioids, including OxyContin. Like the Purdue companies, the Mundipharma companies were at all relevant times owned and controlled by the Sacklers, and the board members of Mundipharma were the same as those of PPLP.  Purdue and the Sacklers commonly referred to the Purdue companies and the Mundipharma companies together as "The Purdue/Mundipharma Group." According to Purdue, "Purdue and a network of independent associated companies (including the Mundipharma and Napp companies) have a presence in more than 30 countries and the collective strength of more than 5000 employees worldwide. This global network has distribution capabilities in all key markets."

99.     Reiner is currently the Sacklers' "Chief Business Officer" at Mundipharma. As late as 2019, Mundipharma was asserting abroad many of the same misleading claims

Case 2:21-cv-03283-JS-SIL   Document 1-1   Filed 06/10/21   Page 22 of 36 PageID #: 31

about opioids that previously led to criminal liability in the United States.

**Impact of Opioid Abuse, Addiction, and Diversion in Plaintiffs' Communities**

100.    Nationally, the sharp increase in opioid use has led directly to a dramatic increase in opioid abuse, addiction, overdose, and death. Scientific evidence demonstrates a very strong correlation between therapeutic exposure to opioid analgesics, as measured by prescriptions filled, and opioid abuse. "Deaths from opioid overdose have risen steadily since 1990 in parallel with increasing prescription of these drugs." Prescription opioid use contributed to 16,917 overdose deaths nationally in 2011—more than twice as many deaths as heroin and cocaine combined; drug poisonings now exceed motor vehicle accidents as a cause of death. More Americans have died from opioid overdoses than from participation in the Vietnam War.

101.    This same trend has been true throughout New York State, within the City of New York, and within each of the Counties.  Municipalities are on the front lines of containing and combatting the opioid epidemic and are confronting the demands the epidemic has placed on municipal health, social welfare, child welfare, emergency response, and law enforcement systems.

102.    In New York State, there were 3,224 overdose deaths among residents in 2017 of which 1,044 involved commonly prescribed opioids, 1,356 involved heroin, and 2,238 involved synthetic (i.e., man-made) opioids (other than methadone). There was a 200 percent increase in the number of opioid overdose deaths in New York State between 2010 and 2017.

103.    From 2006 to 2012, three billion prescription opioids were supplied to New York State (3,338,304,794, enough for 25 pills per year for every resident), with increases year to year. Roughly 2.5 to 2.7 million opioid prescriptions were filled within New York City each year from 2014 through 2016.  Substantial quantities of prescription opioids are also purchased illegally on the street without prescription.

104.    Over the same time period, hospitalization rates in New York State related

Case 2:21-cv-03283-JS-SIL   Document 1-1   Filed 06/10/21   Page 23 of 36 PageID #: 32

to opioids increased from 9.7 per 100,000 to 15.0 per 100,000, and neonatal abstinence rates increased from 1.2 per 1,000 hospital births to 2.8 per 1,000 hospital births. Deaths in New York State that were adjudicated as due to opioids increased in New York State, from 1.14 per 100,000 in 1999 to 15.8 per 100,000 in 2017, with some evidence of non-linear variation in the years in between. Indeed, from 1999 to 2017, there have been 20,119 opioid overdoses in New York State, which is fourth highest in absolute numbers compared to any other state, based on available data from vital statistics. Overall, among New York State residents, opioid burden (including outpatient ED visits and hospital discharges for non-fatal opioid overdose, abuse, dependence, and unspecified use; and opioid overdose deaths) increased from 57,354 in 2016 to 59,600 in 2017 and the crude rate per 100,000 population increased from 292.0 to 304.2, respectively.

105.    The landscape of this epidemic has changed significantly in the last decade. While in 2002, it was still relatively rare to have an opioid overdose in most communities, it is now commonplace and has spread throughout New York by impacting every county, city and town.

106.    As described in the New York State Opioid Annual Report for 2019 prepared by the New York Department of Health:

> The opioid epidemic is an unprecedented crisis. Besides the dramatic increase in the number of deaths identified in the past few years, this epidemic has devastated the lives of those with OUDs, along with their families and friends. We are also seeing an increase in the number of newborns diagnosed with neonatal abstinence syndrome. Those with OUDs are at higher risk for HIV, hepatitis C, and chronic diseases. Finally, there is the rising economic impact on society with healthcare costs for their treatment, costs for law enforcement efforts and emergency medical responses, and when overdose deaths occur, the costs for county coroners and medical examiners.

107.    Each of the Plaintiffs spends millions of dollars each year to provide and pay for health care, services, pharmaceutical care and other necessary services and programs on behalf of residents of their counties whom are indigent or otherwise eligible

Case 2:21-cv-03283-JS-SIL Document 1-1 Filed 06/10/21 Page 24 of 36 PageID #: 33

for services, including payments through services such as Medicaid for prescription opioids.

108. Plaintiffs also provide a wide range of other services to their residents, including law enforcement, services for families and children, and public assistance.

109. Plaintiffs have been forced to expend exorbitant amounts of money to address the opioid crisis. Plaintiffs are also responsible for either partially or fully funding a medical insurance plan for their employees, including the costs of prescription drugs, including opioids.

110. The costs of addressing the public health crisis created by the enormous influx of opioids are and will continue for some time to be huge. These costs include the costs of primary, secondary and tertiary prevention; the costs of treatment for opioid overdoses, for opioid use disorder, and for other conditions related to and arising from the opioid crisis; the costs of addressing neonatal abstinence syndrome and the impact of the opioid crisis on other special populations; as well as the costs of educating doctors and the public to understand the true risks and benefits of opioids.

111. The health effects have also been dramatic in the City of New York. In 2016, there were 1,374 drug overdose deaths in New York City, 437 more than the previous year. Eighty-two percent (82%) of these deaths involved an opioid (either prescription or street drugs like heroin and illegally-manufactured fentanyl), and the number of drug overdose deaths has increased within the City in each of the last six years. Rates of drug overdose deaths in New York City more than doubled between 2010 and 2016, increasing from 8.2 per 100,000 residents in 2010 to 19.9 per 100,000 residents in 2016. Overdose rates rose among all demographic groups and among residents of nearly every New York City neighborhood. The New York City Department of Health and Mental Hygiene ("DOHMH") reports that drug overdose deaths impact every neighborhood and demographic in New York City.

112. Armed robberies of pharmacies, shootings, home invasions and other

21

Case 2:21-cv-03283-JS-SIL   Document 1-1   Filed 06/10/21   Page 25 of 36 PageID #: 34

violent crimes are all associated with prescription drug diversion. Criminal acts have been committed not only by individuals seeking to obtain opioids outside of treatment for chronic pain, but even by some physicians who have found it lucrative to prescribe opioids to supply a secondary market for the misuse and diversion of opioids.

113.    The opioid crisis is placing a growing burden on hospitals within the City. For example, in 2016, some estimates suggest there were more than 40,000 opioid-related hospital emergency department visits, up from an estimated 24,000 in 2014.  DOHMH estimates that there were at least 10,000 non-fatal overdoses within the city in 2016.  City hospitals bear the burden of treating uninsured individuals who need emergency or other treatment related to opioid addiction.

114.    The opioid crisis is causing a similar burden on the City's emergency response systems, such as paramedic services, police, and other emergency responders.

115.    The opioid crisis is placing a burden on the City's criminal justice system as a significant segment of drug prosecutions within the City concern prescription opioid misusers and those who have transitioned from prescription drugs to heroin.

116.    In March 2017, New York City Mayor Bill de Blasio announced an initiative entitled "Healing NYC:  Preventing Overdoses, Saving Lives."  The initiative, costing more than $160 million over five years, employs twelve strategies designed to reduce and prevent the impacts of opioid addiction within the City, with the goal of reducing opioid overdose deaths by 35% over the next 5 years.  Among other things, the City through Healing NYC is distributing over 100,000 naloxone kits (naloxone is used in overdose emergencies to reverse the narcotic's effect), undertaking substantial outreach efforts to educate doctors and other prescribing providers on proper use of opioids and safeguards against misuse, outreach to connect tens of thousands of people who misuse drugs with medication-assisted treatment and harm reduction programs, increased law enforcement efforts and preparedness for treating non-fatal overdose victims.

117.    The HealingNYC initiative also involves: new mental health clinics in

22

Case 2:21-cv-03283-JS-SIL   Document 1-1   Filed 06/10/21   Page 26 of 36 PageID #: 35

targeted high schools, rapid assessment and response programs targeting up to five high-risk neighborhoods per year, expanded addiction access to medication-assisted treatment for 20,000 additional New Yorkers by 2022, and many other measures.

118.    Also under HealingNYC, the New York City Police Department ("NYPD") is expanding its lab capacity to test for drugs found in overdose cases (fatal and non-fatal), its overdose response initiative to deploy additional specialized squads to neighborhoods hardest hit by the opioid crisis, and its capacity to investigate opioid suppliers and traffickers.

119.    Even before the City announced the HealingNYC initiative, the City's increased use of naloxone in various settings has proved costly.  For example, between 2014 and 2017, NYPD spent $1.6M on naloxone and training officers on its proper use. The New York City Fire Department similarly spent $1.4M during the same period.

120.    Finally, the opioid crisis has placed a fiscal burden on the City in the form of paying for or reimbursing the cost of health care, including opioid prescriptions, to the extent that the City pays for City employees through a prescription drug benefit or Workers' Compensation, or for those who are incarcerated and receive health services within the City's correctional system, or for beneficiaries of the state medical assistance program.

121.    The opioid crisis, and its impact on public health, is ongoing throughout New York State, including within the City of New York, and within each of the Plaintiff counties.

**Joint and Several Liability with Purdue**

122.    McKinsey formed a common plan with Purdue to commit the tortious acts alleged herein, and McKinsey actively took part in those acts, or furthered them by cooperation or request, or by lending lend aid or encouragement, or by ratifying and adopting  acts done for their common benefit.

123.    McKinsey gave substantial assistance and encouragement to Purdue

regarding conduct McKinsey knew to be tortious.

124.    Accordingly, McKinsey is jointly and severally liable for the wrongs committed by Purdue within the scope of their common plan.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION

### DECEPTIVE ACTS AND PRACTICES

### New York General Business Law § 349

125.    Plaintiffs incorporate the allegations of all prior paragraphs within this Complaint as if they were fully set forth herein.

126.    Defendants' acts were consumer oriented.

127.    Defendants' acts and/or practices are "deceptive or misleading in a material way" and include but are not limited to:

    a.  misrepresenting the truth about how opioids lead to addiction;

    b.  misrepresenting that opioids improve function;

    c.  misrepresenting that addiction risk can be managed;

    d.  misleading doctors, patients, and payors through the use of misleading terms like "pseudoaddiction";

    e.  falsely claiming that withdrawal is simply managed;

    f.  misrepresenting that increased doses pose no significant additional risks;

    g.  falsely omitting or minimizing the adverse effects of opioids and overstating the risks of alternative forms of pain treatment.

128.    Defendants' acts and/or practices caused actual harm to Plaintiffs.

129.    Plaintiffs have been injured as a result of Defendant's acts and/or practices.

130.    New York General Business Law § 349 declares unlawful any deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in the state, and allows any person who has been injured by reason of any violation of that statute to bring an action to recover actual damages.

Case 2:21-cv-03283-JS-SIL   Document 1-1   Filed 06/10/21   Page 28 of 36 PageID #: 37

131.    Defendants violated New York General Business Law § 349, because they engaged in false advertising in the conduct of a business, trade or commerce in this state.

132.    Defendants violated New York General Business Law § 349, because they engaged in false advertising in the conduct of a business, trade or commerce in this state.

133.    Plaintiffs are entitled to recover their damages caused by Defendants' the violation of New York General Business Law § 349 in an amount to be determined at trial, subject to trebling, plus attorneys' fees.

SECOND CAUSE OF ACTION

FALSE ADVERTISING

**New York General Business Law §350**

134.    Plaintiffs incorporate the allegations of all prior paragraphs within this Complaint as if they were fully set forth herein.

135.    Defendants violated New York General Business Law § 350, because they engaged in false advertising in the conduct of a business, trade or commerce in this state.

136.    Defendants' acts were consumer oriented and triggered reliance by patients, physicians and others.

137.    Defendants' acts and/or practices are "deceptive or misleading in a material way" and include but are not limited to:

    a.  misrepresenting the truth about how opioids lead to addiction;

    b.  misrepresenting that opioids improve function;

    c.  misrepresenting that addiction risk can be managed;

    d.  misleading doctors, patients, and payors through the use of misleading terms like "pseudoaddiction";

    e.  falsely claiming that withdrawal is simply managed;

    f.  misrepresenting that increased doses pose no significant additional risks;

    g.  falsely omitting or minimizing the adverse effects of opioids and overstating the risks of alternative forms of pain treatment.

25

138.    Defendants' acts and/or practices caused actual harm to Plaintiffs.

139.    Plaintiffs have been injured as a result of Defendants' acts and/or practices.

140.    Plaintiffs and their residents have been injured by reason of Defendants' violation of § 350.

141.    Plaintiffs are entitled to recover its damages caused by Defendants' violation of New York General Business Law § 350 in an amount to be determined at trial, subject to trebling, plus attorneys' fees.

### THIRD CAUSE OF ACTION
### NEGLIGENCE

142.    Plaintiffs incorporate the allegations of all prior paragraphs within this Complaint as if they were fully set forth herein.

143.    McKinsey, through its work with Purdue, owed a duty of care to Plaintiffs, pursuant to which it would not encourage the over-marketing and over-prescribing of a controlled substance known at the time to be addictive and known at the time to be a threat to public health.

144.    In violation of this duty, for years McKinsey devised and assisted Purdue with implementing a sales and marketing campaign, including Project Turbocharge, that would dramatically increase the amount of OxyContin prescribed and distributed to the Plaintiffs' citizens. In the process, McKinsey continually devised misleading claims regarding OxyContin as part of their efforts to get health care providers to write more and more OxyContin prescriptions.

145.    As a direct and proximate result of McKinsey's negligent conduct, Plaintiffs have suffered and will continue to suffer harm.

146.    Plaintiffs are entitled to recover their damages caused by Defendants' negligence in an amount to be determined at trial, plus attorneys' fees.

26

Case 2:21-cv-03283-JS-SIL   Document 1-1   Filed 06/10/21   Page 30 of 36 PageID #: 39

### FOURTH CAUSE OF ACTION

### NEGLIGENT MISREPRESENTATION

147.    Plaintiffs incorporate the allegations of all prior paragraphs within this Complaint as if they were fully set forth herein.

148.    McKinsey, through its work with Purdue, owed a duty of care to Plaintiffs to exercise reasonable care in the marketing of opioids.

149.    McKinsey, in the course of its business with Purdue, failed to exercise reasonable care or competence when obtaining and communicating false information regarding Purdue's opioids that McKinsey knew would be used for the guidance of others in their business transactions, including the healthcare providers within Plaintiffs' communities who were capable of prescribing Purdue's drugs.

150.    Plaintiffs are among the governmental entities to whom McKinsey knew Purdue intended to supply the false information regarding opioids.

151.    McKinsey knew that the false information was material to healthcare providers' decisions to prescribe opioids to patients. McKinsey intended that such statements be relied upon to encourage additional opioid prescriptions.

152.    As a proximate result, McKinsey and its agents have caused Plaintiffs to incur excessive costs related to diagnosis, treatment, and cure of addiction or risk of addiction to opioids, Plaintiffs have borne the massive costs of these illnesses and conditions by having to provide necessary resources for care, treatment facilities, and law enforcement services for Plaintiffs' residents and using Plaintiffs' resources in relation to opioid use and abuse.

153.    McKinsey's acts and omissions imposed an unreasonable risk of harm to others separately and/or combined with the negligent and/or criminal acts of third parties.

154.    Plaintiffs are entitled to recover their damages caused by McKinsey's negligent misrepresentations in an amount to be determined at trial, plus attorneys' fees.

## FIFTH CAUSE OF ACTION

## PUBLIC NUISANCE

155.     Plaintiffs incorporate the allegations of all prior paragraphs within this Complaint as if they were fully set forth herein.

156.     Plaintiffs bring this claim against McKinsey under New York common law, which confers upon counties the power to suppress all nuisances that are or may be injurious to the health and welfare of Plaintiffs' citizens. Plaintiffs further seeks to recover costs associated with the nuisance and its abatement.

157.     McKinsey's conduct caused, contributed to, or maintained an opioid epidemic in Plaintiffs' communities that constitutes a public nuisance.

158.     McKinsey's acts and/or omissions annoy, injure, or endanger the comfort, repose, health, and/or safety of the public. The annoyance, injury, and danger to the comfort, repose, health, and safety of Plaintiffs' citizens includes, but is not limited to, increases in:

      a.  drug overdoses, including fatal overdoses;

      b.  drug addiction;

      c.  illicit drug use;

      d.  newborns testing positive for drugs; and

      e.  drug related crime.

159.     McKinsey developed marketing strategies that were prepared for Purdue, purchased by Purdue, and implemented by Purdue with McKinsey's ongoing assistance. These strategies knowingly enflamed an opioid abuse and addiction epidemic that has caused Plaintiffs, their businesses, communities, and citizens to bear enormous social and economic costs including increased health care, social services, criminal justice, and lost work productivity expenses, among others.

160.     Plaintiffs seek abatement of the public nuisance McKinsey caused, contributed to, and/or maintained.

Case 2:21-cv-03283-JS-SIL   Document 1-1   Filed 06/10/21   Page 32 of 36 PageID #: 41

### SIXTH CAUSE OF ACTION

### FRAUD (ACTUAL AND CONSTRUCTIVE) AND DECEIT

161.    Plaintiffs incorporate the allegations of all prior paragraphs within this Complaint as if they were fully set forth herein.

162.    McKinsey made and caused to be made false representations to healthcare providers working in Plaintiffs' communities and/or omitted material facts, regarding the risks, efficacy, and medical necessity of opioids, generally, and Purdue's opioids, specifically. McKinsey knew these representations were false, made recklessly without knowledge of the truth, and/or had no reasonable ground for believing such assertions. Specifically, McKinsey knowingly and/or recklessly:

   a.   Downplayed the substantial risks of addiction and other side-effects of opioids generally, and Purdue's opioids specifically, including crafting Purdue's marketing plan to affirmatively state in sales calls and other marketing channels that Purdue's drugs were not as addictive or prone to abuse as they truly are; stating that classic signs of addiction were actually an indication of "pseudoaddiction" requiring additional administration of opioids, and omitting the high risks of addiction actually present;

   b.   Overstated the efficacy of opioids, generally, and Purdue's opioids, specifically, including making false statements regarding the effectiveness of the drugs for treating specific subsets of the patient population (i.e. those with osteoarthritis) and their ability to improve patient function; and

   c.   Misrepresented the medical usefulness and necessity of opioids, generally, and Purdue's opioids, specifically, including affirmatively marketing their drugs for off label uses (i.e. osteoarthritis) without solicitation and not in response to questions from healthcare providers.

163.    McKinsey and Purdue's misrepresentations and omissions had a tendency to deceive others, to violate public confidence, and/or injure public interests. McKinsey,

Case 2:21-cv-03283-JS-SIL   Document 1-1   Filed 06/10/21   Page 33 of 36 PageID #: 42

having chosen to craft the marketing plan used by Purdue to make representations to healthcare providers regarding their opioids, were under a duty to disclose the whole truth, and not disclose partial and misleading truths.

164.     McKinsey intended healthcare providers throughout the United States, including in Plaintiffs' communities, to rely upon McKinsey's false statements regarding the risks, efficacy, and medical necessity of opioids generally, and Purdue's opioids specifically, in order to increase the number of opioid prescriptions made by healthcare providers.

165.     Healthcare providers in Plaintiffs' communities did in fact rely on the false representations made in Purdue's marketing plan created by McKinsey and implemented with McKinsey's assistance.

166.     McKinsey acted with knowledge and willful intent, with reckless disregard for the rights of others, and/or intentionally and with malice towards others.

167.     Plaintiffs suffered actual pecuniary loss as a result of McKinsey's fraudulent representations and omissions.

### SEVENTH CAUSE OF ACTION
### UNJUST ENRICHMENT

168.     Plaintiffs incorporate the allegations of all prior paragraphs within this Complaint as if they were fully set forth herein.

169.     McKinsey was compensated for its work increasing opioid sales for Purdue.

170.     This compensation for increasing the sales of Purdue's deadly products constitutes money in the possession of McKinsey that, in equity and good conscience, McKinsey ought not be allowed to retain.

### EIGHTH CAUSE OF ACTION
### REQUEST FOR DECLARATORY RELIEF UNDER CPLR 3001

171.     Plaintiffs incorporate the allegations of all prior paragraphs within this Complaint as if they were fully set forth herein.

INDEX NO. 610739/2021
RECEIVED NYSCEF: 06/07/2021

Case 2:21-cv-03283-JS-SIL   Document 1-1   Filed 06/10/21   Page 34 of 36 PageID #: 43

172.    CPLR 3001 authorizes the Supreme Court to "render a declaratory judgment having the effect of a final judgment as to the rights and other legal relations of the parties to a justiciable controversy."

173.    The Master Agreement between McKinsey and Purdue contains an indemnification provision pursuant to which Purdue agrees to indemnify and hold harmless McKinsey and its Associated Companies and the directors, officers, stockholders, agents and employees of McKinsey and such Associated Companies from and against all actions, proceedings and claims brought by third parties against Purdue and/or McKinsey relating to or arising out of the services provided by McKinsey under the agreement.

174.    Plaintiffs are claimants in the Purdue bankruptcy. Any claim for indemnity made by McKinsey in the Purdue bankruptcy under the Master Agreement could have the effect of reducing the value of Plaintiffs' claims in the Purdue bankruptcy.

175.    Plaintiffs allege in their proofs of claim that their claims arise from Purdue's tortious, deceptive, unreasonable, or otherwise unlawful conduct with respect to the marketing, promotion, sale, and/or distribution of prescription opioid products. They further allege that Purdue acted jointly with others. McKinsey has argued to this Court that claims such as those made by Plaintiffs in this action, if successful, could give rise to indemnification and/or contribution claims by McKinsey against Purdue and therefore may affect property of Purdue's bankruptcy estate.

176.    If would be contrary to public policy for McKinsey to be indemnified by, or to receive contribution from Purdue for the wrongdoing alleged herein.

177.    The doctrine of *in pari delicto* bars McKinsey from being indemnified by, or to receive contribution from Purdue for the wrongdoing alleged herein.

178.    Plaintiffs are entitled to a declaration that under New York law McKinsey is not entitled to indemnification or contribution from Purdue for any liability arising from the wrongdoing alleged herein.

FILED: SUFFOLK COUNTY CLERK 05/31/2021 01:55 PM INDEX NO. 610739/2021

NYSCEF DOC. NO. 2 Case 2.21-cv-03283-JS-SIL Document 1-1 Filed 06/10/21 Page 35 of 36 PageID #: 44 RECEIVED NYSCEF: 06/07/2021

## JURY DEMAND

Plaintiffs request a trial by jury on all issues so triable.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray that this Court enter judgment against Defendant as follows:

A.  Awarding Plaintiffs their actual damages for the damages caused by the opioid epidemic, including but not limited to (1) costs for providing medical care, additional therapeutic and prescription drug purchases, and other treatments for patients suffering from opioid-related addiction or disease, including overdoses and deaths (2) costs for providing treatment, counseling and rehabilitation services, (3) costs for providing treatment of infants born with opioid-related medical conditions, (4) costs for providing care for children whose parents suffer from opioid-related disability or incapacitation, (5) costs associated with law enforcement and public safety relating to the opioid epidemic, and (6) costs associated with drug court and other resources expended through the judicial system.

B.  Ordering the remedy of abatement to address the ongoing public nuisance caused by the opioid epidemic, establishing an abatement fund from which the costs of abatement will be paid, and ordering Defendants to fund the abatement fund in an amount that will permit the Plaintiff to abate the nuisance;

C.  Ordering disgorgement of all money or things of value received by McKinsey from Purdue or the Sacklers;

D.  Awarding Plaintiffs punitive damages;

E.  Awarding Plaintiffs their reasonable attorneys' fees, all costs and expenses, pre-judgment and post-judgment interest; and

F.  Providing all other and further relief as this Court may deem just and proper.

Case 2:21-cv-03283-JS-SIL   Document 1-1   Filed 06/10/21   Page 36 of 36 PageID #: 45

Dated: May 31, 2021

Respectfully submitted,

/s/ Jayne Conroy

Jayne Conroy
Thomas I. Sheridan, III
Andrea Bierstein
SIMMONS HANLY CONROY LLC
112 Madison Avenue
New York, NY 10016
(212) 784-6401
jconroy@simmonsfirm.com
tsheridan@simmonsfirm.com
abierstein@simmonsfirm.com

Counsel for Plaintiffs